1
2
3
4
5
6
7
8
9       UNITED STATES DISTRICT COURT
10      EASTERN DISTRICT OF CALIFORNIA
11
12
13
14
15  CHRISTINE SUZANNE NEY,        ) 2:08-193-GW
16              Petitioner,       )
17      v.                        ) MEMORANDUM DECISION
18  DOYLE BLANEY,                 )
19              Respondent,       )
20  _____ )

21      Pro se Petitioner, a prisoner in the custody of the California Department of

22  Corrections, challenges a conviction in California Superior Court, Sacramento

23  County (Case No. 02F09957).

24      On March 12, 2004, a jury found Petitioner guilty of one count of

25  operating an endless chain scheme in violation of California Penal Code § 327.

26  On August 26, 2004, the court ordered the imposition of judgment and sentence

27  stayed, and placed Petitioner on five years probation.

28      On direct review, Petitioner asserted four claims, including the two due

1

process claims she asserts on federal habeas corpus review.  The California Court of Appeal affirmed Petitioner's conviction and sentence in an opinion dated August 23, 2006.  Petitioner filed a Petition for Review in the California Supreme Court, asserting only the two claims she asserts here.  That court summarily denied review on November 1, 2006.

Petitioner filed the present Petition for Writ of Habeas Corpus ("Pet.") on January 4, 2008.  Respondent filed an Answer and Memorandum of Points and Authorities ("Resp. P&A") on March 5, 2008.  On March 16, 2008, Petitioner filed her Reply.

## I.  FACTUAL BACKGROUND

The following factual summary derives from the opinion of the California Court of Appeal.

WHW [Women Helping Women] called itself a "gifting club." Participation was limited to women.  The WHW terminology, like the name "Women Helping Women," has a homey, domestic theme.  WHW purported to be "a group of women devoted to helping and supporting one another."

A typical WHW attestation tugs the charitable heartstrings: "I first heard about WHW from my sister who is a manicurist in Shingle Springs. She told me about this gifting club that was for women only, and the intent of the club was to help women like ourselves.  Women who have big bills to pay, who have faced cancer [and] have hospital bills, who are raising children on their own, who have family members in need or kids to put through college, women who have [gone] through bankruptcy, who are getting divorced, who have attorney bills or are just plain struggling."

The core of the WHW scheme is as follows: Entering participants make a cash "gift" for the purpose of receiving eight times their initial investment.  The entering participants' subscriptions fill eight positions of

$5,000 each at the first level of the scheme.  These positions were called "appetizer plates."  Participants could subscribe for the whole $5,000 plate and receive $40,000 at payout or they could subscribe for a portion of a plate, e.g., one-quarter for $1,250 resulting in a $10,000 payout.  Each plate was divided into eighths, worth $625 a piece.

If the following second generation of recruits' subscriptions fill in 16 appetizer plates, the entire first generation advances through the second level of the scheme.  The second level positions were called "soup and salad plates."

If the following third generation of recruits' subscriptions fill in 32 appetizer plates, the entire first generation advances through the third level of the scheme and the entire second generation through the second level. The third level positions were called "entree plates."

If the following fourth generation of recruits' subscriptions fill in 64 appetizer plates, the entire first generation advances through the fourth level of the scheme ("desert plates") and receives the eightfold $40,000 payout, a so-called "birthday," from those subscriptions.  The second and third generations also move up a level.

As each subset generation of eight appetizer plates ascended a level they were divided into two fiscally separate groups.  Thus, if recruitment goes well, after three generations, each is at the apex of a subordinate pyramid, or in WHW lingo a "chart," of two entrees, four soup and salads, and eight paying appetizers.

As a result of this division, the charts are free to proceed independently, at different rates.  Some chart branches with successful recruiters proliferate rapidly, while others could take longer to generate payouts, if at all. [Petitioner] did not feel sorry for charts that were progressing slowly, as "they weren't working hard enough."

1   Under WHW's guidelines personal recruitment of new participants
2   was not a "mandatory" requirement to reach the payout apex of the
3   pyramid.  However, personal recruitment of three additional participants
4   per chart was explicitly urged as a duty of all.  For example, the guidelines
5   provide that if those a participant bring in do not recruit their share, they
6   "need to take that responsibility and work to bring their [three] ladies in
7   for them."   If a participant fulfills her duty to recruit three others then,
8   after her "birthday" payout, she was permitted to rejoin, to ascend another
9   derivative chart toward another payout.

10   WHW became a sizeable enterprise.  It claimed to have 10,000
11   participants from Auburn to Bakersfield and to have paid out over $11
12   million.  WHW's administration was provided by the participants.

13   Potential recruits, sometimes as many as 100 at a time, were given a
14   sales pitch at a WHW social event by a "presenter."  The presenter was
15   required to understand the WHW program and to explain it to potential
16   recruits.  WHW provided a detailed script for the presenter's pitch.  The
17   presenter was also responsible for dealing with "uninvited guests (District
18   Attorney, Police, troublemakers, etc.)[.]"

19   The key event of the WHW organization was the "birthday party,"
20   where the cash subscriptions for appetizer plate status were paid to the
21   dessert plate participant(s) at the apex.  A WHW "officiator" was in
22   charge of the entire event, seeing to organization of the room, security,
23   calling upon the appetizer plate women to make their payments,
24   responding to problems, and turning in reporting documents to WHW.

25   The "counter" had the role of counting the payments for the
26   officiator and paying them over to the birthday girls.  The counter was also
27   responsible for signing and dating the receipt sheets.

28   "Hostesses' provided their home or a business facility for use for a

4

1    meeting.  They would provide WHW literature and snacks and soft drinks.

2        A "chart leader" was the participant on a WHW chart who
3    documented the activity of the chart.  Chart leaders would communicate
4    with chart participants weekly, encouraging them and inviting them to
5    WHW dinner parties.  They taught other participants their responsibilities
6    concerning birthday parties.

7        When a chart was complete the chart leader made the arrangements
8    for scheduling and conducting the birthday party.  This included
9    telephoning (or delegating the task to a "gift line confirmer") to confirm
10   the lineup of appetizer plate participants making cash payments.

11       [Petitioner] first became involved in WHW in April of 2002.  She
12   became a participant on 49 charts.  Subtracting money she reinvested into
13   the scheme, she drew about $55,000 in payouts from WHW, all or part of
14   the proceeds from seven WHW birthdays.

15       She was the chart leader on 12 charts.  She was a hostess, using her
16   home for several WHW events.  She served as a gift line confirmer, a
17   counter and an officiator.  She was also a frequent, enthusiastic, and
18   accomplished presenter.  Her voluminous WHW e-mail correspondence
19   evinces an intense, time-consuming and sustained role in administering
20   WHW charts and exhorting her compatriots on in their recruitment efforts.

21   [Court of Appeal Opinion, attachment to Petition at 2-6.]

22                    ## II.  **PETITIONER'S CLAIMS**

23   Petitioner raises the following claims:

24   1.    Petitioner's right to due process was violated because she was
25         convicted of operating an endless chain scheme without sufficient
26         evidence that Women Helping Women was an endless chain scheme
27         or that Petitioner was an "operator" within the meaning of Cal.
28         Penal Code § 327, and;

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.      Section 327, as interpreted by the court of appeal, was
        unconstitutionally vague in violation of Petitioner's right to due
        process. [Pet. 4.]

### III.  STANDARD OF REVIEW

A federal court may review a habeas petition by a person in custody under a state court judgment "only on the grounds that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). Federal habeas relief is not available for state law errors.  Swarthout v. Cook, __ U. S. __, 131 S. Ct. 859, 861, __ L. Ed. 2d __ (2011)(*per curiam*)(citing Estelle v. McGuire, 502 U.S. 62, 67, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991)).

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas relief on a claim adjudicated on its merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 784-85, __ L. Ed. 2d __ (2011).

"Clearly established Federal law" means federal law clearly defined by the holdings of the Supreme Court at the time of the state court decision.  Cullen v. Pinholster, __ U.S. __, 131 S. Ct. 1495, __ L. Ed. 2d __ (2011); Harrington v. Richter, 131 S. Ct. at 785; Williams v. Taylor, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  "To determine whether a particular decision is

'contrary to' then-established law, a federal court must consider whether the
decision 'applies a rule that contradicts [such] law' and how the decision
'confronts [the] set of facts' that were before the state court." Cullen v.
Pinholster, 131 S. Ct. at 1399 (citing Williams, 529 U.S. at 405-06). "If the
state-court decision 'identifies the correct governing legal principle' in existence
at the time, a federal court must assess whether the decision 'unreasonably
applies that principle to the facts of the prisoner's case.'" Cullen v. Pinholster,
131 S. Ct. at 1399 (citing Williams, 529 U.S. at 413).

"'[A]n *unreasonable* application of federal law is different from an
*incorrect* application of federal law.'" Harrington v. Richter, 131 S. Ct. at 785
(quoting Williams, 529 U. S. at 410)(emphasis in original). "A state court's
determination that a claim lacks merit precludes federal habeas relief so long as
'fairminded jurists could disagree' on the correctness of the state court's
decision." Harrington v. Richter, 131 S. Ct. at 786 (citing Yarborough v.
Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004)).[1]

## IV.  ANALYSIS

## A.    PETITIONER IS NOT ENTITLED TO HABEAS RELIEF ON HER SUFFICIENCY OF THE EVIDENCE CLAIM

In Ground One, Petitioner contends that the evidence was insufficient to
show that WHW was an endless chain scheme pursuant to Cal. Penal Code
§ 327.  Nor, she contends, was there sufficient evidence to show that Petitioner
was an operator of WHW. [Pet. 11-18.]  This claim does not warrant federal

---

[1]A federal habeas court must defer, under § 2254(d), to a state court
decision on the merits, "even where there has been a summary denial."
Cullen v. Pinholster, 131 S. Ct. at 1402 (citing Harrington v. Richter, 131
S. Ct. at 784).  A federal "habeas court must determine what arguments
or theories supported, or . . .could have supported, the state court's
decision; and then it must ask whether it is possible fairminded jurists
could disagree that those arguments or theories are inconsistent with the
holding in a prior decision of [the Supreme] Court."  Harrington v.
Richter, 131 S. Ct. at 786.

habeas relief.

On habeas review of the sufficiency of the evidence to support a criminal conviction, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Additional deference is added to this standard by 28 U.S.C. § 2254(d), which requires the petitioner to demonstrate that the state court's adjudication involved an unreasonable application of the Jackson standard.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).

"[T]he standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n. 16; see also Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004)(en banc).  "The reviewing court must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).  "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." Id. (internal quotation marks and citations omitted).

California law provides as follows:

> Every person who contrives, prepares, sets up, proposes, or operates any endless chain is guilty of a public offense, and is punishable by imprisonment in the county jail not exceeding one year or in state prison for 16 months, two, or three years.

> As used in this section, an "endless chain" means any scheme for the disposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for

introducing one or more additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant introduces a new participant.  Compensation, as used in this section, does not mean or include payment based upon sales made to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme.

Cal. Penal Code § 327.

Petitioner contends that WHW did not meet the foregoing definition of an endless chain scheme, "because it did not make the receipt of a prospective payout contingent on the introduction of new members into the group." [Pet. 12.] Petitioner disputes the California Court of Appeal's finding that WHW was an endless chain scheme on the ground that the appellate court unreasonably relied on the fact that the organization as a whole depended on recruitment to sustain itself, while that is not how the statute defines endless chain scheme.  Petitioner asserts that, "because the statute targeted organizations that required each participant to bring in new members, WHW was not an endless chain scheme." [Pet. 15.]

The court of appeal reasoned as follows:

The provisions of the Penal Code "are to be construed according to the fair import of their terms, with a view to effect its objects to promote justice."  (§ 4.)  The manifest object of section 327 is to prevent the fraudulent losses inevitable in a pyramid scheme, i.e., one where ongoing compensation requires recruitment of an endless chain of new participants. The inherent fraud is that earlier participants acquire their gains at the expense of the later participants who are left holding the bag when the scheme collapses.

That pernicious outcome remains inevitable in a scheme like WHW where recruitment by every participant is not technically "mandatory."

9

Nonetheless, the early participants must on average recruit approximately three new participants each or there is no payout and the chart fails. If one does not "take that responsibility . . . [another participant must] work to bring their [three] ladies in for them." Review of the history of [Petitioner's] group of WHW charts revealed that overall 13 percent of the participants were "winners" and 87 percent were "losers."

Regardless of the chance of a non-recruiter/participant receiving compensation through WHW, it is still a fair description of the scheme to say that "a [typical, average, usual, or ordinary] participant pays" to receive compensation for introducing others into the scheme. (§ 327.) The introduction of others into the scheme is the essential element on which compensation depends. No recruits equal no compensation.

A non-recruiting WHW participant may occasionally have reached the apex of a four-generation pyramid chart and received compensation. But even in that unusual case, as a group, the "participant[s] pay[] a valuable consideration for the chance to receive compensation for introducing one or more additional persons into participation in the scheme [or when those persons introduce others]." (§ 327.) As a group, the participants' compensation from the WHW scheme necessarily depends upon their recruitment of new participants.

Another way to pose the [Petitioner's] question is to ask whether the phrase "a participant pays" in section 327 should be read in the singular only as "every participant pays" or, in the plural, as "the participants pay." The [Petitioner], in effect, suggests that the singular reading is required.

Section 7 says: "[T]he singular number includes the plural, and the plural the singular." This allows the singular in statutory language to be read as including the plural, when necessary to achieve the manifest purpose of a provision.

In *In re Mathews* (1923) 191 Cal. 35, the defendant sought to avoid liability for violating an ordinance banning one person from keeping goats within a prescribed distance of another's dwelling because the goats were owned by several persons in common.  The Supreme Court answered as follows: "The ordinance involved herein would be entirely ineffectual if not discriminatory, if it made the keeping of goats lawful when done by several persons and unlawful when done by one.  Construing the word 'person' as including the singular only, the intention of the [L]egislature would be defeated and an absurd result reached.  We are therefore of the opinion it should be read as including the plural . . . " (*Id.* at p. 43.)

Similar reasoning applies here.  If those who contrive, prepare, set up, propose or operate an endless chain scheme could evade section 327 by allowing for a few rare participants to receive compensation without personal recruitment, the statute would be entirely ineffectual and a similarly absurd result reached.  Accordingly, we read section 327 to include the plural in the definition of an "endless chain": It is a scheme in which "[the participants pay] for the chance to receive compensation for introducing one or more additional persons into participation in the scheme . . . ." (*Ibid.*)  WHW was such an endless chain scheme.

Therefore, [Petitioner's] several contentions that turn on the claim that WHW is not within the definition of section 327 lack merit.  The contention that there is no substantial evidence of an endless chain fails because WHW was within the statute's definition.

[attachment to Petition at 8-10.]

The United States Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005)(<u>citing</u>

1  Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385
2  (1991); and Mulaney v. Wilbur, 421 U.S. 684, 691, 95 S. Ct. 1881, 44 L. Ed. 2d
3  508 (1975)).  Accordingly, this court is bound by the state courts' interpretation
4  of Cal. Penal Code § 327 in Petitioner's case.

5      Further, under the definition of an "endless chain scheme" articulated by
6  the court of appeal, a reasonable jury could have found beyond a reasonable
7  doubt that WHW constituted an endless chain scheme within the meaning of Cal.
8  Penal Code § 327.  Specifically, trial evidence established that payouts from
9  WHW were dependent on recruiting new participants into the organization,
10  regardless of whether each individual participant recruited new members.
11  Relying on the court of appeal's interpretation of Cal. Penal Code § 327, and
12  construing the foregoing evidence in favor of the prosecution, it is plain that a
13  reasonable jury could have concluded that WHW constituted an endless chain
14  scheme. See Jackson, 443 U.S. at 319.

15      Petitioner also contends that the evidence was insufficient to establish that
16  she was an operator of WHW. [Pet. 15-18.] In particular, she asserts that "[t]here
17  was no evidence that [she] contrived, prepared, set up or proposed WHW." [Pet.
18  15.]

19      Addressing this issue on direct review, the court of appeal rejected
20  Petitioner's contention that, because she did not set policy for WHW, Petitioner
21  was not a manager and could not have "operated" the scheme.  Citing People v.
22  Sanchez, 62 Cal. App. 4th 460, 471 (1998), the court of appeal found that, "[t]he
23  Sanchez holding squarely fits [Petitioner's] role in 'operating' WHW":

24          "The role of each [defendant] as testified to by the prosecution
25      witnesses can aptly be described as that of one who 'operate[d]' the
26      endless chain. [The defendant] called the other individuals to announce the
27      time and location of the meetings, most of which were held at the home of
28      [the defendants]. [The defendants] then conducted the meetings, lectured

12

1    at the meetings, explained the rules and requirements, prepared pyramid

2    charts, and collected the money."

3         We agree with the *Sanchez* opinion that to "operate" an endless

4    chain does not require control of the entire scheme.  (<u>Accord</u>, *People v.*

5    *Ramirez* (2000) 79 Cal. App. 4th 408, 414-15 [operation only requires

6    "active involvement," not a supervisory role].)  The line between

7    participant and operator drawn in section 327 is that between victim and

8    victimizer. [footnote omitted.] The [Petitioner's] activities are of the latter

9    order.

10        [Petitioner] kept the scheme going and growing by her active,

11   energetic efforts.  She bears responsibility for a large number of

12   participants joining and staying active; at one point she boasted the

13   number of "[m]y girls" was "about 100."  Her activities were far beyond

14   the level of a mere participant.  The evidence is adequate to show that she

15   "operated" the WHW endless chain scheme within the meaning of section

16   327.  [attachment to Petition at 13-15.]

17   This court is bound by the state courts' definition of an "operator" for

18   purposes of Cal. Penal Code § 327.  <u>Bradshaw</u>, 546 U.S. at 76.  Moreover, the

19   trial evidence demonstrated Petitioner's active and intense efforts to promote and

20   continue the activities of WHW.  Construed in favor of the prosecution, it cannot

21   be found that the jury's verdict was unreasonable in light of the trial evidence of

22   Petitioner's activities in connection with WHW.  Therefore, the state courts'

23   denial of Petitioner's claim was not contrary to, nor did it involve an

24   unreasonable application of, clearly established federal law as determined by the

25   United States Supreme Court, nor was it an unreasonable determination of the

26   facts.  <u>See</u> 28 U.S.C. § 2254(d).  Accordingly, Petitioner is not entitled to habeas

27   relief on Claim One.

28   **B.    THE STATE COURTS' REJECTION OF PETITIONER'S**

                                   13

**VAGUENESS CLAIM WAS OBJECTIVELY REASONABLE**

Petitioner asserts that Cal. Penal Code § 327, as interpreted by the court of appeal, was unconstitutionally vague, in violation of her right to due process. [Pet. 4.] Petitioner contends that she "had no fair warning that her participation in WHW would be criminal under a statute that defines an endless chain scheme as one where each participant must recruit members in order to receive a payout." [Pet. 23.]

To satisfy due process, "a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." Skilling v. U.S., _ U.S. _, 130 S. Ct. 2896, 2927-28, 177 L. Ed. 2d 619 (2010)(citing Kolender v. Lawson, 461 U.S. 352, 357, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983)). Due process requires that statutes "clearly delineate the conduct they proscribe," particularly "when criminal sanctions are at issue or when the statute abut[s] upon sensitive areas of basic First Amendment freedoms." Humanitarian Law Project v. Mukasey, 552 F.3d 916, 928 (9th Cir. 2009). "The standard for unconstitutional vagueness is whether the statute 'provide[s] a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.' " Maldonado v. Morales, 556 F.3d 1037, 1045 (9th Cir. 2009)(quoting United States v. Williams, 553 U.S. 285, 128 S. Ct. 1830, 1845, 170 L. Ed. 2d 650 (2008)).

Finding that its earlier discussion addressing Petitioner's sufficiency challenge to the state law "implicitly reject[ed]" Petitioner's vagueness contentions, the court of appeal concluded as follows:

> . . . In order for section 327 to be ambiguous, it must be reasonably susceptible of two constructions. (See *People v. Irwin* (1984) 155 Cal. App. 3d 891, 897.) However, as we have explained, there is no reasonable

14

basis to conclude that the definition in section 327 is meant to exclude a pyramid scheme on the extraneous basis that a few participants could achieve a payout without personal recruitment of new participants. That construction is not reasonable and affords no tenable basis for the claim that the statute is vague for failing to provide fair warning.

[Petitioner] argues that "proof positive of the confusion created by section 327" is "[t]he fact that WHW [unabashedly] held itself out as a legal organization." This is, of course, no proof at all. The question is whether the statute provides fair warning, not whether those self-interested in evading its proscription take that warning.

Moreover, an organization confident of its legality does not instruct its functionaries on how to deal with the police and district attorney when they arrive at its presentations. WHW materials advising that it was not a pyramid scheme and did not violate section 327 are irrelevant.

It is common knowledge you do not get something for nothing. An eightfold return from new subscriptions manifestly cannot be sustained indefinitely. The vagueness doctrine will not lend itself to the pretextual evasion of section 327. (See *Amsterdam*, supra, 109 U. Pa. L. Rev. at p. 87, fns. 98 & 99.) [attachment to Petition at 11-12.]

The state courts' rejection of Petitioner's vagueness claim was not objectively unreasonable.  As discussed above, Cal. Penal Code § 7 provided Petitioner fair warning that Cal. Penal Code § 327 could be read to include the plural when words were in the singular.  Moreover, as a matter of general fairness, it was foreseeable that WHW, a scheme that relied on a continual stream of new recruits in order for a small percentage of participants to receive payouts, with the majority *not* receiving payouts *and* losing their initial investment, was an endless chain scheme of the type prohibited by Cal. Penal Code § 327.  See Colten v. Kentucky, 407 U.S. 104, 110, 92 S. Ct. 1953, 32 L.

1   Ed. 2d 584 (1972)("The root of the vagueness doctrine is a rough idea of
2   fairness."); see also U.S. v. Lanier, 520 U.S. 259, 271, 117 S. Ct. 1219, 137 L.
3   Ed. 2d 432 (1997).  Due process requirements are not "designed to convert into a
4   constitutional dilemma the practical difficulties in drawing criminal statutes both
5   general enough to take into account a variety of human conduct and sufficiently
6   specific to provide fair warning that certain kinds of conduct are prohibited."
7   Colten, 407 U.S. at 110.  Based on the foregoing, it is clear that the state courts'
8   denial of Petitioner's vagueness claim was not an unreasonable application of
9   clearly established Supreme Court law.  28 U.S.C. § 2254(d).  Claim Two is
10  denied.

11       THEREFORE, IT IS ORDERED that Petitioner's Petition for Writ of
12  Habeas Corpus is DENIED, and the action dismissed with prejudice.

13
14  DATED:  September 27, 2011
15
16  _____
17                 GEORGE H. WU
              UNITED STATES DISTRICT JUDGE
18
19
20
21
22
23
24
25
26
27
28

16